UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

REPORT AND RECOMMENDATION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Willard Hince Jr.; Jimmie Ramey;
Crawford Wilson; Chris Coker;
James Poole; Charlie Stone;
and Alex Carner,

                Plaintiffs,

    vs.

Minnesota Department of Human
Services, Minnesota State Operated
Services; Minnesota Sex Offender
Program; Kevin Goodno, individually
and in his capacity as the Commissioner
of the Minnesota Department of Human
Services; Michael Tessneer, individually
and in his capacity as Chief Operating
Officer of Minnesota State Operated
Services; Steven Huot, individually and
in his capacity as Program Services
Director of the Minnesota Sex Offender
Program; Dean Mooney, individually
and in his capacity as the Chief
Operating Officer/Director of the
Minnesota Sex Offender Program;
and Jennifer Service, M.D., individually

and in her official capacity as Medical
Director of Minnesota State Operated
Forensic Services,

        Defendants.        Civ. No. 05-2690 (RHK/RLE)

  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*  \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Applications of the Plaintiffs for leave to proceed <u>in forma pauperis</u>, ("IFP"), <u>Docket Nos. 2 through 8</u>, and upon the various other Motions of the Plaintiffs.  For the reasons which follow, we recommend that the Plaintiff's IFP application be denied, that the action be summarily dismissed, and that the remaining Motions of the Plaintiffs be denied, as moot.

## II.  Factual and Procedural Background

The Plaintiffs have each been adjudicated a sexual psychopathic personality and/or a sexually dangerous person, see, <u>In re Civil Commitment of Carner</u>, 2003 WL 22481102 (Minn. App., November 4, 2003); <u>In re Civil Commitment of Ramey</u>, 648 N.W.2d 260 (Minn. App. 2002); <u>Poole v. O'Keefe</u>, 2002 WL 550961 at \*1 (D. Minn., April 10, 2002); <u>Hince v. O'Keefe</u>, 632 N.W.2d 577, 579 (Minn. 2001); <u>In re Wilson</u>,

2000 WL 1182807 (Minn. App., August 22, 2000); In re Civil Commitment of Coker,

200 WL 1617874 (Minn. App., October 31, 2000); In re Stone, 376 N.W.2d 511, 514

(Minn. App. 1985), and each is currently a patient in the Minnesota Sex Offender

Program, at Moose Lake, Minnesota ("MSOP").  The Plaintiffs have commenced this

action, under Title 42 U.S.C. §1983, contending that the Defendants violated a number

of Minnesota statutory protections, and have deprived them of their rights, and

privileges and immunities, under both the Minnesota, and United States Constitutions.

Complaint, at ¶30.

The allegations in the Plaintiffs' Complaint disclose that the Plaintiffs are

challenging several newly implemented policies, which were part of an institutional

"realignment," and which were designed to alleviate overcrowding at the MSOP

facilities.[1]  Allegedly, as part of the "realignment," the Defendant Dean Mooney

("Mooney") issued a Memorandum which advised that "patient privileges will

become more closely tied to patient behavior and an assessment of an individual's

security risk, rather than progress (or lack of progress) in treatment." Id. at ¶18, see,

Declaration of the Plaintiffs, at Exh. 3.   The Plaintiffs also challenge the

---

[1]The Plaintiff's use of the term "realignment" appears to be a reference to the transfer of several patients from the MSOP facilities in Moose Lake, Minnesota, to a comparable facility in St. Peter, Minnesota.  See, Complaint, at ¶19.

implementation of a new Property Allowance protocol, which, allegedly, has expanded the scope of materials that are considered contraband and purportedly resulted in the Plaintiffs being deprived of the "possession and enjoyment" of personal property, such as computers, scanners, and other personal effects. Id. at ¶19.[2] Assertedly, the new protocol was instituted in order to address a lack of space, at the Program facilities, and the Plaintiffs contend that the materials were confiscated without due process of law.

In addition to the Property Allowance protocol, the Plaintiffs challenge a newly implemented policy concerning telephone access, id. at ¶21; the establishment of an "administrative restriction" status for Program patients, which allegedly "may include increased monitoring, program limitation, loss of privileges, restricted access to and use of possessions, and separation of a patient from the normal living environment," id. at ¶22; the establishment of a work program, where earnings are allegedly "divided between the participating patient and the [Program] in an effort to reduce state costs,"

---

[2]Each of the Plaintiffs has averred to having lost "such property as clothing, socks, underwear, T-shirts, personal towels, wash-cloths, Music CDs' [sic], computer software, computer equipment such as scanners, CD burners [sic]." See, Affidavit of Alex Carner, at ¶8; Affidavit of Chris Coker, at ¶8; Affidavit of Willard Hince Jr., at ¶9; Affidavit of James Poole, at ¶8; Affidavit of Jimmy Ramey, at ¶8; Affidavit of Charlie Stone, at ¶8; and Affidavit of Crawford Wilson, at ¶8.

id. at ¶23; and the placement of restraints on patients during transport to locations outside of the Program facilities.  Id. at ¶24.

Moreover, the Plaintiffs allege that "[t]he MSOP treatment program, as realigned, includes unreasonable searches and lockdowns, denial of education and employment, denial of yard time (including recreation and exercise), delay censorship, denial of communications (including mail, correspondence, packages, publications, etc.), denial and unreasonable monitoring of telephone and email communications, excessive and unreasonable restrictions on visitation, denial of religious services, and denial of access to the courts (including access to a library, legal materials and legal counsel)."  Id. at ¶25.

The Plaintiffs contend that such newly implemented policies are "detrimental to their physical, mental, emotional, and psychological well-being," id. at ¶26, and that the policies "do not advance any legitimate therapeutic purpose, are not necessary for the maintenance and safety to patients, staff or the public and radically change the terms of the MSOP treatment program previously relied upon by patients in an effort to gain release from their indeterminate detention."  Id. at ¶29.  They also urge that, as a result of the alleged policy changes, they are being deprived of the following rights:

(a)    to treatment which is consistent and which realistically addresses the individual conditions for which they were initially committed;

(b)    to access telephones, computers, correspondence, visitors, legal counsel, and medical records;

(c)    to be free from unreasonable searches, seizures, physical restraints/isolation and restrictions of free speech;

(d)    to privacy;

(e)    to be free of conversion, taking and/or destruction of their property except for individual cases involving documented risks to patients, staff and/or public safety or a behavior specific, individualized, documented and legitimate therapeutic purpose;

(f)    to just compensation for the loss of personal and business use of their confiscated, damaged and/or destroyed property taken for the public purpose of providing additional MSOP space;

(g)    to be free of involuntary servitude as non-criminal citizens coerced into working to contribute to the costs of their own involuntary confinement in order to merit advancement in treatment; and

(h)    to be free from excessive, unreasonable and punitive restrictive conditions.

Id., at ¶32.

The Plaintiffs seek declaratory and injunctive relief, as well as compensatory and punitive damages.

III.  Discussion

An IFP application will be denied, and the action dismissed, when a plaintiff has filed a pleading that is "frivolous," or fails to state a claim upon which relief can be granted. Title 28 U.S.C. § 1915(e)(2)(B)(i) and (ii); Atkinson v. Bohn, 91 F.3d 1127, 1128 (8th Cir. 1996); Christianson v. Clarke, 147 F.3d 655, 658 (8th Cir. 1998), cert. denied, 523 U.S. 1023 (1998).  In determining whether a Complaint should be dismissed under Section 1915(e)(2), for the failure to state a claim upon which relief can be granted, the appropriate standard of review is the same as that applied to a Motion to Dismiss, under Rule 12(b)(6), Federal Rules of Civil Procedure. See, Geitz v. Overall, 62 Fed.Appx. 744, 746 (8th Cir., April 11, 2003), citing Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997); Goodroad v. Bloomberg, 1997 WL 633078 at *1 (8th Cir., October 15, 1997).

Accordingly, in reviewing the Plaintiffs' Complaint, we consider all of the facts alleged in the Complaint as true, and construe the pleadings in a light most favorable to the Plaintiffs.  See, e.g., Brotherhood of Maintenance of Way Employees v. Burlington Northern Santa Fe Railroad, 270 F.3d 637, 6388 (8th Cir. 2001).  In addition, because the Plaintiffs are proceeding pro se, we liberally construe their Complaint.  See, Coleman v. Watt, 40 F.3d 255, 258 (8th Cir. 1994).  Under this

- 7 -

standard, "[a] complaint shall not be dismissed for its failure to state a claim upon which relief can be granted unless it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of a claim entitling him to relief." Young v. City of St. Charles, 244 F.3d 623, 627 (8th Cir. 2001), citing Breedlove v. Earthgrains Baking, 140 F.3d 797, 799 (8th Cir. 1998); Helleloid v. Independent School Dist. No. 361, 149 F. Supp.2d 863, 866-67 (D. Minn. 2001).

"Nevertheless, dismissal under Rule 12(b)(6) serves to eliminate actions which are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." Young v. City of St. Charles, supra at 627, citing Neitzke v. Williams, 490 U.S. 319, 326-27 (1989). "To avoid dismissal, a complaint must allege facts sufficient to state a claim as a matter of law and not merely legal conclusions." Id., citing Springdale Educ. Ass'n v. Springdale Sch. Dist., 133 F.3d 649, 651 (8th Cir. 1998). "On a motion to dismiss, "[t]he court may consider, in addition to the pleadings, materials embraced by the pleadings and materials that are part of the public record." Carlson v. Arrowhead Concrete Works, Inc., 375 F. Supp.2d 835, 838 (D. Minn. 2005), quoting In re K-tel International, Inc. Securities Litigation, 300 F.3d 881, 889 (8th Cir. 2002).

Here, we find that, even with the benefit of a liberal construction, the Plaintiffs'

Complaint must be dismissed, as their claims for damages against the Defendants, in

their official capacities, as well as their claims for relief pursuant to Minnesota State

law, are barred by the Eleventh Amendment, and because the Plaintiffs have failed to

state a cause of action under Federal law.  Meyer v. City of Joplin, 281 F.3d 759, 761

(8th Cir. 2002)("To establish a claim under [Section] 1983, [a plaintiff] must show a

deprivation of a right, privilege, or immunity secured by the Constitution or laws of

the United States."), quoting Dunham v. Wadley, 195 F.3d 1007, 1009 (8th Cir. 1999),

cert. denied, 531 U.S. 819 (2000).

A.	The Plaintiff's Claims for Damages.  The Eleventh Amendment provides

that "[t]he Judicial power of the United States shall not be construed to extend to any

suit in law or equity, commenced or prosecuted against one of the United States by

Citizens of another State, or by Citizens or Subjects of any Foreign State."  United

States Constitution, Amendment XI.  For over a century, the Amendment has been

understood to stand for the proposition that a non-consenting State is immune from

Federal Court suits by its own citizens, as well as by citizens of another State.  See,

Kimel v. Florida Board of Regents, 528 U.S. 62, 72 (2000); Seminole Tribe of Florida

v. Florida, 517 U.S. 44, 54 (1996); Hans v. Louisiana, 134 U.S. 1, 15 (1890)(such

- 9 -

suits were "not contemplated by the constitution when establishing the judicial power of the United States").

In effect, the Eleventh Amendment immunizes from suit a "state agency or official * * * if immunity will 'protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself.'"  Hadley v. North Arkansas Community Technical College, 76 F.3d 1437, 1438 (8th Cir. 1996), quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 123 n. 34 (1984); see also, Regents of the University of California v. Doe, 519 U.S. 425 (1997); Edelman v. Jordan, 415 U.S. 651 (1974); Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464 (1945), overruled on other grounds, Lapides v. Board of Regents of University System of Georgia, 535 U.S. 613, 614-15 (2002).

Over the years, the Supreme Court has fashioned a patchwork of exceptions to the Eleventh Amendment's limitation on Federal Court jurisdiction, as that doctrine was initially expressed in Hans v. Louisiana, supra.  Under the doctrine of Ex parte Young, 209 U.S. 123 (1908), a Federal Court retains jurisdiction, notwithstanding the Eleventh Amendment, to direct State officials to conform their practices to the requirements of Federal law, even though such an injunction might have collateral

- 10 -

effects upon a State Treasury.[3]  See, <u>Edelman v. Jordan</u>, supra at 667-68; <u>Milliken v. Bradley</u>, 433 U.S. 267, 289 (1977).  However, such an exercise of jurisdiction does not extend to the award of retroactive relief, which requires the payment of funds from the State Treasury.  See, <u>Edelman v. Jordan</u>, supra at 667-68.  Thus, the Eleventh Amendment bars actions, in Federal Court, which seek monetary damages from individual State Officers, in their official capacities, as well as State Agencies, because such lawsuits are essentially "for the recovery of money from the state." <u>Ford Motor Co. v. Department of the Treasury</u>, supra 464; see also, <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 71 (1989)("[N]either a State nor its officials acting in their official capacities are 'persons' under §1983" when sued for damages.).

Here, the Plaintiffs have sued the Defendants in both their individual and official capacities,[4] and have sought both monetary damages and injunctive relief.

---

[3]In <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 126 (1984), the Court held that pendent State law claims, for even prospective injunctive relief, were barred by the Eleventh Amendment and, to that extent, the doctrine in <u>Ex parte Young</u> was substantially narrowed.

[4]While the Plaintiffs have brought this suit against the Defendants in their "individual," as well as "official" capacities, they have not alleged specific actions taken by the named Defendants, with the exception of Mooney, who is alleged to have issued a number of Memoranda, to the Plaintiffs, as well as other MSOP patients, advising them of the implementation of the challenged policies.  As such, their claims
(continued...)

Since the Defendants are State officials, the Plaintiffs claims against the Defendants for damages, in their official capacities, are barred by the Eleventh Amendment, and therefore, must be dismissed.

      B.    <u>The Plaintiffs' Claims for Deprivation of their Rights Under State Law</u>.

It appears that several of the Plaintiffs' claims are predicated on alleged violations of Minnesota law.  Specifically, the Plaintiffs assert that "Minnesota law requires that each committed citizen has a right to receive proper care and treatment," and "gives each committed patient the right to an individualized and behavior specific program and or treatment plan that patients have been denied." <u>Complaint</u>, at ¶ 17.  They further allege that "Minnesota law gives each committed patient the right of access to telephones, correspondences, medical records, visitors, the legal system and reasonable access to their own property including, but not limited to, computers, printers, music/radio/televisions, books, magazines, and other personal property." <u>Id.</u> While no State statutes have been identified in the Complaint, the accompanying

---

      [4](...continued)
are clearly of the type contemplated in official capacity actions.  See, <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985)(contrasting individual capacity suits, which "seek to impose personal liability upon a government official for actions he takes under color of state law," with official capacity suits, which "generally represent only another way of pleading an action against an entity of which an officer is an agent.").

submissions make reference to the Patients' Bill of Rights, see, <u>Minnesota Statutes</u> <u>Section 144.651, et</u> <u>seq.</u>  See, <u>Affidavit of Alex Carner</u>, at ¶9; <u>Affidavit of Chris</u> <u>Coker</u>, at ¶9; <u>Affidavit of Willard Hince Jr.</u>, at ¶9; <u>Affidavit of James Poole</u>, at ¶9; <u>Affidavit of Jimmy Ramey</u>, at ¶9; <u>Affidavit of Charlie Stone</u>, at ¶9; and <u>Affidavit of</u> <u>Crawford Wilson</u>, at ¶9.

Unfortunately for the Plaintiffs, "[t]he Eleventh Amendment precludes a Federal Court from ordering a state, including its agencies or officials, to conform their conduct to state law."  <u>Randolph v. Rogers</u>, 170 F.3d 850, 859 (8th Cir. 1999), citing <u>Pennhurst State School & Hospital v. Halderman</u>, supra at 106 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials how to conform their conduct to state laws."); <u>Treleven v. University</u> <u>of Minnesota</u>, 73 F.3d 816, 819 n.4 (8th Cir. 1996)("The exception to the Eleventh Amendment carved out by Ex parte Young and its progeny does not extend to lawsuits seeking to enjoin state officers from violating state laws.").  Accordingly, we do not have subject matter jurisdiction over the Plaintiff's claims, to the extent that the Plaintiffs seek vindication of their rights under Minnesota State law.

B.   <u>The Plaintiff's Federal Claims</u>.   In determining the scope of the Constitutional rights asserted, as they apply to the civilly committed individuals, we

apply the same constitutional standards as those afforded to pretrial detainees.   See,

Andrews v. Neer, 253 F.3d 1052 (8th Cir. 2001).  In Andrews, our Court of Appeals

addressed the applicable standard for civilly committed persons, who raise excessive

force claims under Section 1983, noting that the Constitutional Amendment, which

gives rise to an excessive force claim, depends on the person asserting the right,

reasoning as follows:

> If the victim is an arrestee, the Fourth Amendment's
> "objective reasonableness" standard controls.  Graham v.
> Conner, 490 U.S. 386, 388, 190 S.Ct. 1865, 104 L.Ed.2d
> 443 (1989).  The evaluation of excessive-force claims
> brought by pre-trial detainees, although grounded in the
> Fifth and Fourteenth Amendments rather than the Fourth
> Amendment, also relies on an objective reasonableness
> standard.  Johnson-El v. Schoemehl, 878 F.2d 1043, 1048-
> 49 (8th Cir. 1989). * * * Excessive-force claims brought by
> prisoners fall under the protections provided by the Eighth
> Amendment's prohibition of cruel and unusual punishment.
> Whitley v. Albers, 475 U.S. 312, 318-22, 106 S.Ct. 1078,
> 89 L.Ed.2d 251 (1986).

Id.

The Court then determined that the constitutional standard, for civilly committed

persons, should be the same as that applied to pretrial detainees, explaining as follows:

> Andrews's excessive force claim does not fit neatly into an
> analysis based on status as an arrestee, a pre-trial detainee,
> or a prisoner.  Bobby Andrews was held in Fulton after
> having been found not guilty of murder by reason of

- 14 -

insanity, and thus he was not a "prisoner" subject to punishment. * * * The Eighth Amendment excessive-force standard provides too little protection to a person whom the state is not allowed to punish.  On the other hand, the state of Missouri was entitled to hold Bobby Andrews in custody.  His confinement in a state institution raised concerns similar to those raised by the housing of pretrial detainees, such as the legitimate institutional interest in the safety and security of guards and other individuals within the facility, and the efficiency of the facility's operation. * * *Accordingly, we conclude that Andrew's excessive-force claim should be evaluated under the objective reasonableness standard usually applied to excessive force claims brought by pre-trial detainees.

Id. at 1061.

The reasoning in Andrews has been adopted in other contexts, in order to apply the

pretrial detainee constitutional standard of review when considering claims brought

by civilly committed persons.  See, Nelson v. State of Minnesota, 2005 WL 1719369

at *5 (D. Minn., July 20, 2005) adopted, 2005 WL 2205826 (D. Minn., September 8,

2005)(Search and Seizure); Serna v. Goodno, 2005 WL 1324090 at *4 n. 3 (D. Minn.,

June 3, 2005) adopted, 2005 WL 1705623 (D. Minn., July 7, 2005)(same); Meyers v.

O'Keefe, 2004 WL 2212091 at *2-3 (D. Minn., September 30, 2004)(Due Process).

We find this reasoning persuasive, if not controlling here, as to each of the

constitutional violations alleged by the Plaintiffs.  While the Plaintiffs are not detained

by reason of a criminal conviction, each of them has been lawfully detained by the

- 15 -

State of Minnesota.  As such, they do not have the status of either a free citizen, or a

convicted inmate.  Therefore, we concur in the view that their status is most analogous

to that of pretrial detainees, since their lawful detention raises concerns about

institutional safety, order, and efficiency.  Revels v. Vincenz, 382 F.3d 870, 874 (8th

Cir. 2004)("Although an involuntarily committed person at a state hospital is not a

prisoner per se, his confinement is subject to the same safety and security concerns as

that of a prisoner.").  Therefore, we conclude that the Plaintiffs are entitled to no more

protection than is extended to pretrial detainees, and we examine their constitutional

claims under the standard enunciated in Bell v. Wolfish, supra at 556.[5]

Liberally construed, the Plaintiffs' Complaint alleges that the newly

implemented policies violate their right to be free of unreasonable searches and

seizures, their due process rights, their right to free speech, their right to access to the

Courts, as well as the Thirteenth Amendment's prohibition on involuntary servitude,

and the Fifth Amendment's prohibition on takings, without just compensation.  We

address each of these claims in turn.

---

[5]We have consistently applied the same standard of review to civilly committed
individuals and, notwithstanding direct attack, on appeal, by the civilly committed
individual, see Appellant's Brief in Stone v. Harry, 364 F.3d 912 (8th Cir. 2004), 2003
WL 23063665 at *22-26 (2003), our Court of Appeals has affirmed our employment
of that standard.  See, Stone v. Harry, supra at 915.

1.    <u>Unreasonable Searches and Seizures</u>. The Fourth Amendment protects [t]he right of the people to be secure in their persons * * * against unreasonable searches and seizures." <u>United States Constitution, Fourth Amendment</u>. Accordingly, only those searches that are "unreasonable" are protected against encroachment. <u>Bell v. Wolfish</u>, 441 U.S. 520, 558 (1979).  In order to determine whether a search is reasonable, a Court must balance "the need for the particular search against the invasion of personal rights that the search entails." <u>Id.</u> at 559.  Here, aside from the conclusory allegation that the program "includes unreasonable searches and lockdowns," <u>Complaint</u>, at ¶25, the Plaintiffs do not allege that they have been the subject of any search, much less one where the need for the search was outweighed by the invasion of personal rights that the search entailed.  See, <u>Bell v. Wolfish</u>, supra at 559.  Accordingly, the Plaintiffs have failed to allege any viable claim for the conduct of an unreasonable search and seizure.

2.    <u>Access to the Courts</u>.  In <u>Bounds v. Smith</u>, 430 U.S. 817 (1977), the United States Supreme Court explicitly recognized that prisoners retain a constitutional right to meaningful access to the Courts.  The relevant inquiry, in determining whether prison authorities have impinged upon that right, is "whether the prisoner has been given a 'reasonably adequate opportunity' to present his claim."

Martin v. Tyson, 845 F.2d 1451, 1456 (7th Cir. 1988), citing Bounds v. Smith, supra

at 825.  As civilly committed individuals, the Plaintiffs are entitled to meaningful

access to the Courts.  See, King v. Atiyeh, 814 F.2d 565, 568 (9th Cir. 1987); Ward v.

Kort, 762 F.2d 856, 858 (10th Cir. 1985)(mentally committed persons have a right of

access to the Courts); Johnson by Johnson v. Brelje, 701 F.2d 1201, 1207 (7th Cir.

1983).

However, in order to prevail on an access to the Courts claim, the Plaintiffs

must demonstrate some "actual injury."  Lewis v. Casey, 518 U.S. 343, 349 (1996);

see also, Klinger v. Department of Corrections, 107 F.3d 609, 617 (8th Cir. 1997)("In

Lewis v. Casey, the Supreme Court held, based on principles of standing, that actual

injury must be proven in order to prevail on an access-to-courts claim").  There is no

"abstract, freestanding right" of access to legal resources or legal papers; the Plaintiffs

must show that they have been deprived of some specific opportunity to defend

themselves, or advance a viable legal claim, in some particular action.  Lewis v.

Casey, supra at 351; Sabers v. Delano, 100 F.3d 82, 84 (8th Cir. 1996).  They must also

identify some specific injury that arose from that lost opportunity.  Id.  As our Court

of Appeals has observed:

> To state a claim that a law library or legal assistance program violates [the right of access], inmates must assert that they suffered an actual injury to pending or contemplated legal claims. [Lewis v.] Casey, 518 U.S. [343], 116 S.Ct. at 2180. Alleging theoretical inadequacies is insufficient.   Id.   Inmates must instead show, for example, that a complaint they prepared was dismissed due to a technical requirement that a library's inadequacies prevented them from knowing, or that a library was so inadequate that it prevented them from filing a claim for actionable harm at all.  Id.

Myers v. Hundley, 101 F.3d 542, 544 (8th Cir. 1996).

Here, the Plaintiffs appear to allege that the confiscation of personal computers, printers, and CD burners, as well as the newly implemented telephone system, have deprived them of their right to access to the Courts.  Complaint, at ¶20.  They further allege that "[t]he MSOP treatment program, as realigned, includes * * * denial of access to the courts (including access to a library, legal materials and legal counsel)." Id. at ¶25.  However, the Plaintiffs do not identify any specific instance in which they have been deprived of the opportunity to defend themselves, or advance a viable legal claim, in some particular action, and accordingly, their access to the Courts claim fails, as a matter of law.  See, Lewis v. Casey, supra at 351; see also, Cody v. Weber, 256 F.3d 764, 769-770 (8th Cir. 2001)(inmate was not deprived of access to courts by the confiscation of his personal computer, in the absence of an actual injury).

3.     Due Process.  Construed liberally, the Plaintiffs have alleged that a number of conditions of their confinement violate their Due Process rights under the Fourteenth Amendment.  Such conditions include the alleged confiscation of the identified personal effects, the implementation of a new telephone system, the establishment of an "administrative restriction" level of supervision, and the policy of shackling of patients, whenever they are escorted off of the MSOP grounds; and the denial of yard time, education, and employment.

In determining whether there has been a deprivation of due process rights, a Court's first step is to determine whether there is a recognizable liberty or property interest at stake.  See, Board of Regents of State Colleges v. Roth, 408 U.S. 564, 571 (1972).  Only if that threshold question is answered in the affirmative, do we then inquire whether the procedures attendant to that deprivation were constitutionally sufficient.  See, Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 460 (1989).

Here, we fairly read the Plaintiff's allegations -- that the new Property Allowance protocol has deprived them of the "possession and enjoyment" of their personal property -- as an assertion that they have a protected property interest in the items which were confiscated.  "A protected property interest * * * is a 'legitimate

claim of entitlement * * * as opposed to a mere subjective expectancy.'" <u>Bituminous Materials, Inc. v. Rice County, Minnesota</u>, 126 F.3d 1068, 1070 (8th Cir. 1997), quoting <u>Batra v. Board of Regents of the University of Nebraska</u>, 79 F.3d 717, 720 (8th Cir. 1996), quoting, in turn, <u>Board of Regents of State Colleges v. Roth</u>, supra at 577. "Property interests are not created by the Constitution, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source, such as state law.'" <u>Cleveland Board of Education v. Loudermill</u>, 470 U.S. 532, 540 (1985), quoting <u>Board of Regents of State Colleges v. Roth</u>, supra at 577.  However, "federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." <u>Town of Castle Rock, Colorado v. Gonzales</u>, --- U.S. ---, 125 S.Ct. 2796, 2803-4 (2005), quoting <u>Memphis Light, Gas & Water Division v. Craft</u>, 436 U.S. 1, 9 (1978)[emphasis omitted].

Accordingly, under the law of this Circuit, "a state statute or policy can create a constitutionally protected property interest, first, when it contains particularized substantive standards that guide the decision maker and second when it limits the decision maker's discretion by using mandatory language (both requirements are necessary)." <u>Dunham v. Wadley</u>, supra at 1009, citing <u>Jennings v. Lombardi</u>, 70 F.3d

994, 995-96 (8th Cir. 1995). "Statutes or policies that are only procedural, or that grant

to a decision maker discretionary authority in their implementation * * * do not create

a protected property interest." Id.

As is pertinent to the Plaintiffs' claim, Minnesota Statutes Section 253B.185,

Subdivision 7, provides as follows:

> **Rights of patients committed under this section**. (a) The
> commissioner or the commissioner's designee may limit the
> statutory rights described in paragraph (b) for patients
> committed to the Minnesota sex offender program under
> this section or with the commissioner's consent under
> section 246B.02. The statutory rights described in
> paragraph (b) may be limited only as necessary to maintain
> a therapeutic environment or the security of the facility or
> to protect the safety and well-being of patients, staff, and
> the public.

Paragraph (b) goes on to identify a number of statutory rights "which may be limited

in accordance with paragraph (a)," including those which are identified in Minnesota

Statutes Section 144.651, Subdivision 22, which provides, in pertinent part, as

follows:

> **Personal property.** Patients and residents may retain and
> use their personal clothing and possessions as space
> permits, unless to do so would infringe upon rights of other
> patients or residents, and unless medically or
> programmatically contraindicated for documented medical,
> safety, or programmatic reasons.

Applying these two provisions, we are satisfied that the Plaintiffs do not have a protected property interest in their "possession and enjoyment" of the property that is identified in their Complaint, and supporting documents.  Notably, while the language of Section 253B.185, Subdivision 7, provides that "statutory rights described in paragraph (b) may be limited only as necessary to maintain a therapeutic environment or the security of the facility or to protect the safety and well-being of patients, staff, and the public," the right itself, which is identified in Section 144.651, Subdivision 22, is discretionary.

Under closely analogous circumstances, another Magistrate Judge in this District held that Minnesota law did not provide a MSOP patient with a protected property interest in the possession of a computer, reasoning as follows:

> [Section 144.651, Subdivision 22] does not use mandatory language, but merely provides that "residents <u>may</u> retain and use their personal belongings." (Emphasis added).  The permissive "may" indicates that plaintiff does not have an entitlement to possess all of his property.  In addition, the statute enables staff to place restrictions on a patient's possession of personal property.  Residents may possess their belongings only on condition that they do not infringe on others' rights and on condition that the possessions are not medically or programmatically contraindicated.  The statute does not mandate standards or criteria to guide the decisionmaker, instead Program staff have discretion to

> determine whether such infringement or contraindication
> occurs.

Nicoliason v. Milzak, Civ. No. 00-2654 (RHK/JMM)(D. Minn., "Report and Recommendation," July 6, 2001), adopted (August 15, 2001), affirmed, 26 Fed.Appx. 596, 2002 WL 15669 at *1 (8th Cir., January 8, 2002), cert. denied, 536 U.S. 910 (2002).

Similarly, the language of Section 144.651, Subdivision 22, provides the decisionmaker with discretion to restrict a patient's access to their personal property "as space permits."

Here, the Plaintiffs have alleged that their due process rights were violated by the confiscation of a number of personal items, pursuant to a new Property Allowance protocol.  Since the Plaintiffs do not have a constitutionally protected property interest in the possession of those items, their claims, which are based upon the deprivation of such property, necessarily fail.[6]

In considering the remainder of the Plaintiff's Due Process claims, we turn to the Supreme Court's decision in Bell v. Wolfish, supra at 535, where the Supreme Court held that pretrial detainees could not be "punished" without being afforded the procedural protections of Due Process.  In that opinion, however, the Supreme Court

---

[6]The absence of a constitutionally protected property interest also requires the dismissal of the Plaintiffs' claim that they have been deprived of their property without just compensation.

explained that not every sanction imposed against a pretrial detainee could be considered punishment that would give rise to Due Process concerns. Id. at 539 n. 21 ("There is, of course, a de minimus level of imposition with which the Constitution is not concerned."), quoting Ingraham v. Wright, 430 U.S. 651, 674 (1977). Therefore, "if a particular condition or restriction of a pretrial detainee is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'" Smith v. Copeland, 87 F.3d 265, 267 (8th Cir. 1996).

Here, we fairly read the Plaintiffs' Complaint to assert a number of liberty interests, such as a right to be free from "administrative restriction," a right to leave the Program grounds unshackled, a right to yard time, visitation, and employment and educational opportunities.   As to the claims concerning the denial of yard time, visitation, and education and employment opportunities, the Plaintiffs' conclusory allegations are simply too vague to state a claim upon which relief could be granted. See, Hartsfield v. Department of Corrections, 107 Fed.Appx. 695, 695 (8th Cir., August 5, 2004), citing Cooper v. Schriro, 189 F.3d 781, 782, 784-85 (8th Cir. 1999).

The Plaintiffs claims as to the establishment of "administrative segregation," and the policy of shackling patients, while they are off of MSOP grounds, are similarly meritless.  Our Court of Appeals has "consistently held that a demotion to

segregation, even without cause, is not itself an atypical and significant hardship."

Phillips v. Norris, 320 F.3d 844, 847 (8th Cir. 2003), citing Kennedy v. Blankenship,

100 F.3d 640, 642 (8th Cir. 1996)(prisoner's demotion from administrative segregation

to punitive isolation is not the sort of deprivation that qualifies as atypical and

significant.), citing, in turn, Sandin v. Conner, 515 U.S. 472, 483-84 (8th Cir. 1995).

As such, we find that subjecting a civilly committed person to a more restrictive

supervision status does not, in and of itself, constitute "punishment"under Bell, see,

Meyers v. O'Keefe, supra at *3, and accordingly, the Plaintiffs' due process claim

with respect to the establishment of "administrative segregation" necessarily fails.[7]

Similarly, the Plaintiffs claims, which are predicated on their allegedly being

shackled when escorted outside of the program facilities, also fails, as such conduct

does not amount to "punishment" under the Fourteenth Amendment.  See, Haslar v.

Megerman, 104 F.3d 178, 180 (8th Cir. 1997)(policy of shackling pretrial detainees

while they receive off grounds medical treatment did not amount to punishment, as

it "served the legitimate penological goal of preventing inmates awaiting trial from

escaping [the medical center's] less secure confines.").

_____

[7]We further note the absence of any allegation which so much as suggests that
any of the Plaintiffs have personally been subjected to "administrative restriction."

4.     <u>Involuntary Servitude</u>.  The Plaintiffs have also alleged that, "[b]y statutes effective July 1, 2004, patients are coerced by the MSOP program to work in the treatment centers "in order for patients to contribute to the costs of care * * *," and that "[t]he earnings generated must be * * * divided between the participant patient and the center in an effort to reduce state costs."  <u>Complaint</u>, at ¶23.  The Plaintiffs allege that such a program is tantamount to involuntary servitude.  <u>Id.</u>, at ¶32(g).

"Compelling prison inmates to work does not contravene the Thirteenth Amendment."  <u>Ray v. Mabry</u>, 556 F.2d 881, 882 (8th Cir. 1977).  However, since the Plaintiffs are not prisoners, but civilly committed individuals, they are protected by the Thirteenth Amendment's prohibition on involuntary servitude.  See, <u>Martinez v. Turner</u>, 977 F.2d 421, 423 (8th Cir. 1992), cert. denied, 507 U.S. 1009 (1993) ("Requiring a pretrial detainee to work or be placed in administrative segregation is punishment," and is, therefore, prohibited under <u>Bell v. Wolfish</u>.); <u>Bell v. Wolff</u>, 496 F.2d 1252, 1253 (8th Cir. 1974)(same); <u>Cokely v. Endell</u>, 27 F.3d 331, 332 (8th Cir. 1994)(successful Habeas petitioner could not be compelled to work, or be placed in segregated confinement, while awaiting a new Trial); <u>Jobson v. Henne</u>, 355 F.2d 129, 132 (2nd Cir. 1966)(mentally ill patients are protected by the Thirteenth Amendment); <u>Downs v. Department of Public Welfare</u>, 368 F. Supp. 454, 465 (E.D. Pa. 1973)

("[T]he Thirteenth Amendment has applicability in the mental health institution context."); see also, Henry v. Ciccone, 315 F. Supp. 889, 892 (D. C. Mo. 1970), appeal dismissed, 440 F.2d 1052 (8th Cir. 1971).

However, a civilly committed individual may be required to perform certain institutional chores, and it is without question that a civilly committed patient is not subjected to involuntary servitude by a voluntary decision to participate in an institution work program.  See, Henry v. Ciccone, supra at 892; Parks v. Ciccone, 281 F. Supp. 805, 811 (D. C. Mo. 1968)(civilly committed patient who was free to cease working at any time that he wished, without punishment, did not raise a viable involuntary servitude claim); see also, Bell v. Wolff, supra at 1254.

While the Plaintiffs do not specifically identify the statutory provisions that are referenced in their Complaint, our independent research discloses that the work program being challenged was established under Minnesota Statutes Section 246B.05, which is entitled "Minnesota sex offender program; productive day program," and which provides, as follows:

> **Subdivision 1.  Employment option.**  The commissioner of human services, in consultation with the commissioner of corrections, shall develop an employment option for persons committed to a sexual psychopathic personality treatment center in order for patients to contribute to their

cost of care. The employment may include work maintaining the center or work that is brought to the center by an outside source. The earnings generated must be deposited into the account created in subdivision 2 and divided between the participating patient and the center, in an effort to reduce state costs.

**Subd. 2. Minnesota sex offender program; productive day program account**. A productive day program account is created in the state treasury. Money collected by the commissioner of human services for the program under this section must be deposited in this account. Money in the account is appropriated to the commissioner for purposes of this section.

**Subd. 3. Money.** The commissioner has the authority to collect money resulting from the productive day program, and retain 50 percent to reimburse the state for the cost of administering the work program and for the purpose of reducing state costs associated with the Minnesota Sex Offender Program and return 50 percent of the earnings to the patient.

Neither the Complaint, nor the supporting materials, allege that any of the Plaintiffs have personally been compelled to work, or that, upon their refusal to work, they were punished in some manner, such as placement in protective isolation. Rather, it appears that the Plaintiffs are purely challenging the constitutionality of the work program, as a whole. While we were unable to find any case law interpreting the Minnesota Statute, the plain language of that Statute reflects that, contrary to the Plaintiffs

allegations, the productive day program is optional to patients at MSOP facilities. Moreover, the Statute does not contain any provision for the punishment of patients who choose not to work, nor do the Plaintiffs allege that any punishment has been meted out for any refusal to work under the program.  Accordingly, we find that the Plaintiffs' allegations fail to state a claim for involuntary servitude under the Thirteenth Amendment.

     5.   <u>Free Speech</u>.  The Plaintiffs contend that they have been injured as a result of the "restriction of free speech," <u>Complaint</u>, at ¶32(c), but they fail to specify which of their factual allegations support such a claim.   Upon a liberal construction of the Plaintiffs' Complaint, it appears that the Plaintiffs assert that the Defendants violated their First Amendment right in a number of different respects. Specifically, the Plaintiffs have alleged that the Defendants have restricted the total volume of "legal correspondence, loose papers, magazines, and books," that may be stored in their living quarters to those which can be held in a ten-gallon storage container. <u>Complaint</u> at 19.  They have also alleged that the policies of the MSOP treatment program has resulted in "delay, censorship, denial of communications (including mail, correspondence, packages, publications, etc.), denial and unreasonable monitoring of telephone and email communications, excessive and

unreasonable restrictions on visitation, denial of religious services, and denial of access to the courts." <u>Complaint</u>, at ¶25. As to telephone access, the Plaintiffs allege that the Defendants implemented a system that is "similar to that used in Minnesota Department of Corrections facilities." <u>Id.</u> at ¶21

The Supreme Court has held that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." <u>Turner v. Safley</u>, 482 U.S. 78, 84, 89 (1987), citing <u>Procunier v. Martinez</u>, 416 U.S. 396, 413 (1974)("Whatever the status of a prisoner's claim to uncensored correspondence with an outsider, it is plain that the latter's interest is grounded in the First Amendment's guarantee of freedom of speech."); see also, <u>Bear v. Kautzky</u>, 305 F.3d 802, 804 (8th Cir. 2002); <u>Krych v. Hvass</u>, 2003 WL 22955856, at *1 (8th Cir., December 12, 2003); <u>Sterling/Sayyed v. Banks</u>, 72 Fed.Appx. 504, 2003 WL 21802122 at *1 (8th Cir., August 6, 2003). Further, our Court of Appeals has also observed that "it is well settled that inmates have a right to receive mail," <u>Weiler v. Purkett</u>, 137 F.3d 1047, 1049 (8th Cir. 1998), and that, "in some instances prison inmates may have a right to use the telephone for communication with relatives and friends." <u>Benzel v. Grammar</u>, 869 F.2d 1105, 1108 (8th Cir. 1989).

However, those same Courts have also made clear that prisoner's First Amendment rights may be limited by regulations that are "reasonably related to legitimate penological interests." <u>Turner v. Safley</u>, supra at 84; see also <u>Weiler v. Purkett</u>, supra at 1049; <u>Benzel v. Grammar</u>, at 1108. As the Supreme Court explained, in <u>Turner</u>:

> Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in Martinez, additional reason to accord deference to the appropriate prison authorities.

<u>Id.</u> at 84-85; see also, <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 409 (1989)("[S]uch a standard is necessary if prison administrators, and not the courts, are to make the difficult judgments concerning institutional operations.").

Thus, while the Plaintiffs retain their First Amendment rights, the Defendants are within their bounds to impose restrictions that are reasonably related to MSOP objectives.

"In assessing whether a specific restriction is 'reasonably related' to a security interest," the Supreme Court has instructed lower Courts to "heed our warning that '[s]uch considerations are peculiarly within the province and professional expertise

of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations courts should ordinarily defer to their expert judgments in such matters." Block v. Rutheford, 468 U.S. 576, 584 (1984), quoting Bell v. Wolfish, supra at 540-541, n. 23, quoting, in turn, Pell v. Procunier, 417 U.S. 817, 827 (1974).   The Plaintiffs are each convicted sex offenders, who have each been adjudicated as having sexually psychopathic personalities, or as sexually dangerous persons, or both, and the Defendants' have a legitimate interest in the effective treatment of such individuals, as well maintaining the security of the institution.

Aside from the allegation that the newly implemented telephone system is similar to that used in Minnesota Department of Corrections facilities, the Plaintiffs have failed to allege any facts to support their conclusory allegations of censorship, denial of communications, unreasonable restrictions on visitation, and denial of religious services, or any facts which might establish that their own First Amendment rights were violated, or that the newly implemented restrictions were an exaggeration of the legitimate security interests at the MSOP facilities.  See, Block v. Rutheford, supra at 586 (prohibition on contact visits for pretrial detainees was reasonably related to the security interests of a detention center); Benzel v. Grammar, supra at 1108 ("A

prisoner has no right to unlimited telephone use."); United States v. Noriega, 917 F.2d 1543, 1551 n. 10 (11th Cir. 1990) cert. denied sub nom., Cable News Network, Inc. v. Noriega, 498 U.S. 976 (1991)("It is not unusual or unreasonable to condition the use of telephones by penal inmates on monitoring of the telephone calls by the authorities charged with maintaining the security of the penal facility.");  see also, Thornburgh v. Abbott, supra at 411-414 (a prisoner's mail can be restricted for legitimate penological interests); O'Lone v. Estate of Shebazz, 482 U.S. 342, 351 (1987)(prison administrators could limit access to religious services that were reasonably related to penological interest).

As such, the Plaintiffs' have failed to allege a viable First Amendment claim. See, Florez v. Johnson, 63 Fed.Appx. 432, 437 (10th Cir. 2003)("[O]ne sentence claim that the prison 'is now censoring all mail' is simply too vague and conclusory to state a claim for relief."), accord Rice v. Sobitor, 2004 WL 332867 at *3 (E.D. Pa., January 16, 2004); Breece v. Swenson, 332 F. Supp. 837, 843 (D. C. Mo. 1971)(finding that conclusory allegation of the denial of the right to "participate in religious services relative and necessary to his beliefs"did not state a claim absent some degree of factual support).

In sum, upon our review of the Plaintiffs' Complaint under Section 1915(e), it is objectively apparent that the Plaintiffs have failed to state any viable claim under Section 1983. Therefore, we recommend that their respective Motions for leave to proceed IFP be denied, as moot, and that the Complaint be dismissed. Additionally, we recommend that the remainder of the Plaintiff's Motions be denied, as moot.

NOW, THEREFORE, It is –

RECOMMENDED:

1.     That each of the Plaintiffs' individual Applications to Proceed In Forma Pauperis, [Docket Nos. 2, 3, 4, 5, 6, 7, and 8], be denied, as moot.

2.     That the Plaintiffs' Motion to Appoint Counsel [Docket No. 9] be denied, as moot.

3.     That the Plaintiffs' Motion for Permissive Joinder of Plaintiffs [Docket No. 10] be denied, as moot.

4.     That the Plaintiffs' Motion for the Appointment of a Special Master [Docket No. 11] be denied, as moot.

5.     That the Plaintiffs' Motion for a Preliminary Injunction [Docket No. 12] be denied, as moot.

6.     That this action be summarily dismissed pursuant to <u>Title 28 U.S.C. §</u> <u>1915(e)(2)(B)(ii)</u>.


Dated:  December 14, 2005                    *s/Raymond L. Erickson*
                                              Raymond L. Erickson
                                              CHIEF U.S. MAGISTRATE JUDGE

# N O T I C E

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than January 2, 2006**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than January 2, 2006**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.